```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF HAWAII
 3    HEEJOON CHUNG,              )  Case No. CV 1:16-00017
                                 )  ACK-RLP
 4          Plaintiff,           )
                                 )
 5       v.                      )
                                 )
 6    U.S. BANK, N.A., TRUSTEE,  )
      under Securitization       )
 7    Servicing Agreement dated  )
      as of December 1, 2005,    )
 8    Structured Asset           )
      Investment Loan Trust      )
 9    Mortgage Pass-Through      )
      Certificates, Series       )
10    2005-11; and OCWEN LOAN    )
      SERVICING, LLC,            )
11                               )
            Defendants.          )
12    _____   )
13
14
15            DEPOSITION OF HEEJOON CHUNG
16       Taken on behalf of the Defendants at the offices of
17    Alston Hunt Floyd & Ing, American Savings Bank Tower,
18    1001 Bishop Street, Floor 18, Honolulu, Hawaii,
19    commencing at 11:05 a.m. on December 12, 2016,
20    pursuant to Notice.
21
22
23    BEFORE:  JESSICA R. PERRY, CSR NO. 404
24            Certified Shorthand Reporter
25    Pages 1 - 220
```

Page 1

Exhibit 3

1       A.  One bedroom, one bath.

2       Q.  Is there a reason that you moved out of

3   Bridgeport or just wanted to be in a better apartment

4   or why did you move to Black Rock?

5       A.  I went to a military school for about three

6   months, and so, you know, I let go of my lease.  I

7   went to Fort Benning for my -- for my training, for my

8   schooling, and then when I came back, you know, I had

9   to get another apartment.

10      Q.  So in November of '03 where did you get

11  assigned to?

12      A.  Schofield Barracks, Hawaii.

13      Q.  Had you ever been to Hawaii before being

14  assigned here?

15      A.  I'm not sure.  I say that because when I

16  immigrated from South Korea, I think I had a layover

17  here before I went to New York.

18      Q.  When did you immigrate from South Korea?

19      A.  I believe it was November of 1979.

20      Q.  So you were born in South Korea but moved here

21  when you were a young child?

22      A.  Like five, yes.

23      Q.  And what years were you in Schofield?

24      A.  2003 to 2009.

25      Q.  When you first were assigned to Schofield,

Page 23

```
 1        A.  No.

 2        Q.  Did you review any other documents besides the

 3   ones that you've testified to?

 4        A.  I looked at -- no.

 5        Q.  So you, I believe, testified previously, and

 6   correct me if I'm wrong, but you were assigned to

 7   Schofield in 2003, but you were immediately or shortly

 8   thereafter you were deployed to Iraq; is that correct?

 9        A.  Yes.

10        Q.  Okay.  And you went to Iraq in what month and

11   what year again?

12        A.  January of '04 -- excuse me.  Oh, man.

13   January of '04.

14        Q.  And prior to January, for those interim

15   months, you had been sort of couch surfing and finding

16   places to crash in and around Schofield, correct?

17        A.  Yes.

18        Q.  But you don't recall where those places were?

19        A.  I do.

20        Q.  Okay.  Can you tell me?

21        A.  I stayed with -- I stayed at Ewa Beach.

22        Q.  Ewa Beach?

23        A.  Ewa Beach.

24        Q.  When was that?

25        A.  That was like December and January -- December
```

Page 66

```
 1    of '03; I deployed in January of '04.

 2         Q.   What was the -- where were you in Ewa Beach,

 3    at a house?

 4         A.   An apartment.

 5         Q.   Whose apartment was it?

 6         A.   One of the soldiers from my company.

 7         Q.   Do you remember his or her name?

 8         A.   Yes.

 9         Q.   What was the name?

10         A.   First name Marty, last name Brosett.

11         Q.   Can you spell the last name, please?

12         A.   B-R-O-S-E-T-T, I think, I'm not sure.

13         Q.   And he was a fellow soldier in your company

14    and offered you a place before you were going to Iraq;

15    is that correct?

16         A.   Yes.

17         Q.   Was he going to Iraq as well?

18         A.   Yes.

19         Q.   So you shared his apartment for it sounds like

20    a little bit over a month while you were waiting to

21    get deployed?

22         A.   About two months, yes.

23         Q.   Did you pay rent to him?

24         A.   Yes.

25         Q.   Do you recall what you paid?
```

Page 67

1      A.   I gave him $600.

2      Q.   And were you -- was that one of the time

3    periods where you would have been getting BAH?

4      A.   Yes.

5      Q.   Do you recall how much you were getting at

6    that time?

7      A.   No.

8      Q.   Is it accurate to say somewhere between 1,000

9    and $1,500, based on your prior testimony?

10     A.   Approximately.

11     Q.   So if you're paying less in rent than you're

12   getting in BAH, do you have to give the excess back or

13   do you get to keep the money?

14     A.   Get to keep the money.

15     Q.   So you were deployed in January of '04, and I

16   believe your responses to the interrogatory said you

17   came back to Schofield in February of '05; is that

18   correct?

19     A.   Yes.

20     Q.   And, again, just to make sure we're on the

21   same page, from February '05, that's when you started

22   living in the Shimogawa apartment; is that correct?

23     A.   Yes.

24     Q.   And you testified that that was a

25   three-bedroom apartment, correct?

Page 68

1        A.   Yes.

2        Q.   And you were renting one of the rooms?

3        A.   No.

4        Q.   What was the nature of your rental arrangement

5   at the Shimogawa apartment?

6        A.   He just let me stay there to help me out.

7        Q.   That was Chandler?

8        A.   Yes.

9        Q.   And you weren't paying any rent?

10       A.   No.

11       Q.   Okay.  And you previously testified that you

12   stayed there until about September; is that correct?

13       A.   Say that again.

14       Q.   September of '05, you were at the Shimogawa

15   apartment from about February until September of '05;

16   is that correct?

17       A.   Yes.

18       Q.   Where did you begin living in September of

19   '05?

20       A.   I stayed with a fellow soldier in Mililani.

21       Q.   What kind of housing unit was it, a house or

22   an apartment?

23       A.   It was an apartment.

24       Q.   Did you ever pay rent at Shimogawa apartment?

25       A.   No.

Page 69

1     Q.   Were you paying rent in Mililani?

2     A.   I'm not sure.

3     Q.   Who was the person you were staying with in

4  Mililani?

5     A.   His last name was Braggs.

6     Q.   And what, was it a two-bedroom, three-bedroom,

7  what kind of apartment was it?

8     A.   Two-bedroom.

9     Q.   So you were living with Mr. Braggs starting in

10  September '05.  Do you recall how long you were in

11  that apartment?

12     A.   About a month, I think.

13     Q.   Then what happened after a month?

14     A.   I moved into my house.

15     Q.   This is the Ewa Beach property?

16     A.   Yes.

17     Q.   Okay.

18               (Exhibits Nos. 2-3 marked.)

19               THE WITNESS:   What is this?

20  BY MR. ROGERS:

21     Q.   Those are Exhibits 2 and 3 to the deposition.

22  Why don't you take a look.

23               MR. SHKLOV:   Which one is 2?

24               MR. PAER:   Which one is 2?  Oh, the note

25  is 2.

Page 70

1          A.   Yes.

2          Q.   So Borchers is getting deployed to Florida, so

3     you decide you need a new place to live, so you're

4     looking for rental properties, correct?

5          A.   Yes.

6          Q.   What kind of places were you looking for?

7          A.   An apartment.

8          Q.   Did you have an idea of a budget at that point

9     of how much money you wanted to spend on an apartment?

10         A.   I can't remember if I did or not.

11         Q.   And had you -- you hadn't been paying rent at

12    Shimogawa, correct?

13         A.   No, I had not.

14         Q.   Were you -- since you were receiving BAH

15    payments during that time, were you -- you know, were

16    you pooling that money so you could have, you know,

17    money for your next rental that you would have to pay

18    for?

19         A.   No.

20         Q.   So at the time you're looking for this new

21    place to live, do you recall how much your monthly

22    income was?

23         A.   No.

24         Q.   Was it more than $4,000 a month?

25         A.   It could have been.  I don't know.  I can't

Veritext Legal Solutions
866 299-5127

1    then.

2        Q.  So late August through early part of

3    September?

4        A.  Maybe.

5        Q.  So how did you get from looking for an

6    apartment to rent to borrowing $530,000 to buy a

7    house?

8        A.  Borchers suggested -- excuse me, Borchers

9    suggested that I might start looking into purchasing a

10   home as opposed to renting an apartment.

11       Q.  And describe the property to me.  What kind of

12   house is it?

13       A.  The property at Ewa Beach, that 91-743?

14       Q.  (Nodding head.)

15       A.  It's a two-story family house.  It's got four

16   bedrooms or five bedrooms.  It's got four or five

17   bedrooms, two and a half baths.  It's got a backyard,

18   skylight, a parking lanai for two vehicles.  It's got

19   a little patio.

20       Q.  So how -- you're looking for rental properties

21   and not finding anything that you like; is that

22   accurate?

23       A.  Yes, that's accurate.

24       Q.  And then Borchers says to you, hey, you should

25   think about buying?

Page 80

1      A.   Yes.

2      Q.   Do you recall what else he said to you at that

3   or was it just you should buy a house?

4      A.   I don't know if he said -- I can't remember.

5      Q.   It's okay.  Was Borchers a Realtor, or did he

6   have any background in real estate?

7      A.   No.

8      Q.   So how did you -- how did you go about, then,

9   finding the property to buy?

10     A.   Newspaper.

11     Q.   Which newspaper?

12     A.   I don't remember what newspaper it was.

13     Q.   So were you and Borchers looking together in

14  the newspaper?

15     A.   Yeah.

16     Q.   And do you recall how you became aware of the

17  property?  Was it just in the real estate

18  advertisement section?

19     A.   Yes.

20     Q.   Do you recall what it was being -- what the

21  sale price was or what it was being offered for?

22     A.   No.

23     Q.   What was it about the property that interested

24  you?

25     A.   I can't remember what it was.

Page 81

1        Q.   Did you look at any other properties besides
2    this one?
3        A.   Yes.
4        Q.   How many other properties did you look at?
5        A.   I can't remember.
6        Q.   Was it less than ten?
7        A.   Yes.
8        Q.   Less than five?
9        A.   Don't know.
10       Q.   So somewhere between five and ten?  You don't
11   know if it was between five and ten, but less than
12   ten?
13       A.   Yes.
14       Q.   Okay.  Do you recall when you were looking --
15   why did you choose to buy this property?  You looked
16   at other properties too, why was this one the one that
17   you decided to buy, in comparison to those?
18       A.   I can't remember.  I'm having problems
19   remembering ten years ago.
20       Q.   That's okay.
21            So did you go to an open house, or how did
22   you -- how did you first see the property?
23       A.   It was not an open house.  My real estate
24   agent drove me there and -- drove me to the house and
25   I -- and that's how, she just drove me to the property

Page 82

```
 1    Realtor or was it for a specific piece of property?

 2        A.  I can't remember.

 3        Q.  Can't recall, okay.

 4            So you end up talking to Ms. Xay or someone

 5    else at the office about -- what did you say?  Did you

 6    say you wanted a Realtor?

 7        A.  I think -- I'm not sure, you know.  I'm not

 8    sure exactly what I said.  Maybe something to the

 9    effect --

10                MR. PAER:  Don't guess if you don't

11    remember.

12                THE WITNESS:  Yeah, I don't remember.

13    BY MR. ROGERS:

14        Q.  Was it you having these conversations, was it

15    Borchers on your behalf?

16        A.  Me.

17        Q.  So based on Borchers' recommendation, you're

18    now thinking it's a good idea to buy a -- to buy, not

19    rent; is that correct?

20        A.  Yes.

21        Q.  Do you recall why at the time, why you thought

22    buying a piece of property in Hawaii was a good idea?

23        A.  I thought about retiring here, that's why.

24        Q.  So you were interested in staying in Hawaii?

25        A.  Yes.
```

Page 84

1    Q.  Were you concerned when you were thinking

2  about buying a property about, you know, deployments

3  and things that would happen with your military life

4  that would make having a piece of property in a

5  specific place a difficult thing to pay for or

6  maintain?

7    A.  At the time, no.

8    Q.  Did you give any consideration to -- you had

9  just come back from a deployment in Iraq, correct?

10   A.  Yes.

11   Q.  Or recently, and you didn't give any

12 consideration at the time for what would happen, how

13 would I make my mortgage payments if I was deployed

14 again?

15   A.  Okay, slow down for me.  Are we still talking

16 about 2005?

17   Q.  Yeah, we are.

18   A.  All right.  And what was -- you've got to

19 explain that question to me.

20            MR. ROGERS:  Can you read it back.

21            (Record read.)

22            THE WITNESS:  Yes.

23 BY MR. ROGERS:

24   Q.  You did give it consideration at the time you

25 were thinking about buying the property?

Page 85

1      A.  No.

2      Q.  So the parties involved in the negotiations

3  were Jerry; Sandy, as the agent; and you; is that

4  correct?

5      A.  Yes.

6      Q.  Did you get help from anyone else like a

7  lawyer, Borchers, anybody else help you in this

8  process?

9      A.  No.

10     Q.  And you've testified to the property being

11  fairly large, four to five bedrooms.  What was your

12  intent at the time that you were negotiating, were you

13  going to rent out portions of the property?  Why did

14  you need such a big house?

15     A.  Okay.  What was your question again?

16     Q.  When you were negotiating for the purchase of

17  the property, did you have an idea about what you were

18  going to do with the three to four other bedrooms in

19  the house?  Was your intent to rent it?

20     A.  Yes.

21     Q.  So you were intending to live in it and then

22  also get tenants to share the cost with you; is that

23  correct?

24     A.  Yes.

25     Q.  Did you have -- the time you were negotiating

Page 89

1   for the purchase, did you have any tenants that were

2   committed to living there at the property with you?

3       A.   No.

4       Q.   So you're engaged in the negotiations with

5   Ms. Xay and Jerry, and you end up submitting a bid

6   that is accepted; is that correct?

7       A.   Yes.

8       Q.   And am I correct to say that bid was $530,000?

9       A.   Yes.

10      Q.   Am I also correct to say that all of the money

11  that went to the purchase of the house was borrowed?

12  You don't put any money down; is that correct?

13      A.   Yes.

14      Q.   Did you seek -- did you perform any analysis

15  of how much you would have to get in rent to make it

16  so that you could afford the mortgage payments?

17      A.   Yes.

18      Q.   Okay.  You did that on your own, or did you do

19  that with help from anyone?

20      A.   On my own.

21      Q.   And what was your -- if you recall, what was

22  your calculation at the time?  How much money would

23  you need to get in rent to be able to afford your

24  mortgage payment?

25      A.   I took my monthly net, subtracted the

Page 90

 1    note, so.

 2                 MR. ROGERS:  Well, he testified to the

 3    second mortgage.

 4    BY MR. ROGERS:

 5        Q.  So do you recall that you signed those

 6    mortgage documents as well?

 7        A.  Yes.

 8        Q.  And you understood as part of those two loans

 9    that you would have to pay a certain amount of money

10    each month for your mortgage payments, correct?

11        A.  Yes.

12        Q.  And did you have an understanding when you

13    were signing these documents in 2005 what would happen

14    if you didn't make those payments?

15        A.  Say that again.

16        Q.  Did you have an understanding in 2005 --

17                 MR. PAER:  I thought we were going to

18    take a break.

19                 MR. ROGERS:  We are.  I'm just finishing

20    authentication.  Two more questions.

21    BY MR. ROGERS:

22        Q.  Did you have an understanding at the time,

23    Mr. Chung, when you were signing these documents what

24    would happen if you didn't make your mortgage

25    payments?

                                          Page 94

1      A.   No.

2      Q.   You didn't know what would -- if you stopped

3   paying, you didn't know what would happen?

4      A.   No.

5           MR. ROGERS:   Okay, take a break.

6           (Recess taken from 1:23 to 2:08.)

7   BY MR. ROGERS:

8      Q.   Before we took a break, we were discussing the

9   loan transaction where you borrowed $530,000 to

10  purchase the property.  Do you recall the conversation

11  we were having before lunch?

12     A.   Yes.

13     Q.   So tell me about once you agreed to a price,

14  how did you finalize or where -- strike that.

15          Where did you go to sign the note, the

16  mortgages, the notes, the mortgages and the other

17  documents needed to close the purchase of the

18  property?

19     A.   At her office.

20     Q.   At Sandy's office?

21     A.   (Nodding head.)

22     Q.   And do you recall where that was?

23     A.   No.

24     Q.   Was it Aloha Realty?

25     A.   Yeah.

Page 95

1    BY MR. ROGERS:

2         Q.   We'll go back on the record.

3              Do you recall when Mr. Macias started as a

4    tenant?

5         A.   No.

6         Q.   What about Mr. Rios?

7         A.   No.

8         Q.   Was there a time when you weren't residing at

9    the property that any of these gentlemen were living

10   at the property?

11        A.   Can you repeat that question again, please?

12        Q.   Was there ever a time when you were not

13   residing at the property where any of these four

14   individuals were living at the property?

15        A.   No.  What?  One more time.  Was I -- was I not

16   at the house when they were at the house?

17        Q.   I'm more interested because my understanding

18   is you were deployed -- you were deployed at some

19   point after purchasing the property, correct?

20        A.   Yes.

21        Q.   When you were deployed, you weren't living at

22   the property, correct?

23        A.   Yes.

24        Q.   When you were deployed, were any of these

25   individuals living at the property?

Page 104

1     A.   No.   Kicked them all out.

2     Q.   So these people only lived at the property at

3     the time when you were also at the property, correct?

4     A.   Yes.

5     Q.   Okay.   Thank you.

6          And this is the sum total of all the tenants

7     you ever had at the property, these four gentlemen?

8     Did you have any other tenants besides these?

9     A.   Yes.

10    Q.   Yes, you had more tenants?

11    A.   Yes.

12    Q.   Who -- what other tenants?

13    A.   Henley's wife and two daughters moved in, but

14    they didn't pay any additional rent for that.   And

15    then Macias, Tony, excuse me, had his -- moved in his

16    girlfriend Tiffany, but, you know, no additional rent

17    for that.

18    Q.   You don't recall for any of these people how

19    much money they paid you in rent?

20    A.   No.

21    Q.   How would they pay you?

22    A.   How did they pay?

23    Q.   Check?

24    A.   Cash.

25    Q.   That's for everyone, Mr. Ayers?

Page 105

```
 1          A.  Yes.

 2          Q.  Mr. Henley?

 3          A.  Yes.

 4          Q.  Macias?

 5          A.  Yes.

 6          Q.  Rios?

 7          A.  Yes.

 8          Q.  Henley would pay for his wife and daughters?

 9      Oh, no, I'm sorry, excuse me, you said that he didn't

10      pay anything extra?

11          A.  Absolutely not, no.

12          Q.  And same for Macias?

13          A.  Yes.

14          Q.  And did they pay you -- I'm sorry, I've just

15      got to try to get an idea, if you can recall, did they

16      pay you more than a thousand dollars per month?

17          A.  No.

18          Q.  Was it less than -- more than $500 per month?

19          A.  No.

20          Q.  Was it more than $300 per month?

21          A.  Probably.

22          Q.  So somewhere between -- was it between 3 and

23      $500 a month?

24          A.  Yes.

25          Q.  And that applies to Ayers, Henley, Macias, and
```

Page 106

1      Q.   You don't recall how much money you said you

2      made per month when you applied for the loan?

3      A.   I just told you, like 42, 43.

4      Q.   Right.  But I'm asking if you ever put it down

5      on a piece of paper or if you ever told Sandy?

6      A.   I told Sandy.

7      Q.   You told her that you made 42 to $4300 a

8      month?

9      A.   Whatever I was making at the time.

10     Q.   Did she say anything in response?

11     A.   I can't remember what she said.

12     Q.   How would you describe Sandy?

13     A.   Very fast, very fast.  Like that's the first

14     word pops in my head, very fast.

15     Q.   Did you ever stop her and say slow --

16     A.   I couldn't.  I tried, I tried, I attempted,

17     but very fast.

18     Q.   How did you try?  What did you do?

19     A.   Slow down, what, I didn't understand anything

20     you just said right now, what, but, you know, right...

21     Q.   From October 2005, were you finding it -- how

22     would you characterize your ability to make your

23     mortgage payments?  Were you able to do it pretty

24     easily or was it difficult or somewhere in between?

25     A.   Making mortgage payments was easy.  It was

Page 109

1    online, you know, so.

2         Q.   And you could afford it because you were

3    making more than your mortgage payments, correct?

4         A.   Yes.

5         Q.   Were you finding it difficult to pay for other

6    things in your life?

7         A.   Yes.

8         Q.   Did you have the property appraised, or did

9    you get any idea of what it was worth before you

10   borrowed the money to buy it?

11        A.   Sandy did.

12        Q.   Sandy had an appraisal done?

13        A.   I believe so.

14        Q.   Do you have a copy of that appraisal?

15        A.   No.

16        Q.   What makes you believe that one was prepared?

17        A.   What was that?

18        Q.   What makes you believe that one was prepared?

19        A.   Because she told me.

20        Q.   Did you look at it?

21        A.   I don't remember if I did or not.

22        Q.   Do you remember what she told you it was worth

23   or what the appraisal said it was worth?

24        A.   Approximately 530.

25        Q.   So you were paying approximately what the

Page 110

```
 1    property was worth, as far as you knew?
 2         A.  As far as I knew, yes.
 3         Q.  Okay.  The tenants we've talked about, the
 4    tenants that we've talked about, in addition to their
 5    girlfriend and family members, that's all the people
 6    who ever lived at the property with you, correct?
 7         A.  Yes.
 8         Q.  Okay.  So from October 2005, you're living at
 9    the property and stationed at Fort Shafter, correct?
10    Shafter?  Am I correct?
11         A.  No.
12         Q.  Where were you stationed?
13         A.  Schofield Barracks.
14         Q.  Schofield, I apologize.
15              So you're stationed at Schofield, you're
16    living at the property.  At what point did that
17    change?
18         A.  When I deployed to Iraq.
19         Q.  So you deployed a second time?
20         A.  Yes.
21         Q.  What month and year was that, please.
22         A.  December of 2007.
23         Q.  So you get deployed to Iraq.  When did you
24    find out you were getting deployed to Iraq?
25         A.  I don't know for sure.
```

Page 111

1       Q.  It would have been a few months before

2   December of 2007?

3       A.  Yes.

4       Q.  So you know you're going to Iraq.  You know

5   you're not going to be at the property.  What did you

6   do about the property, if anything?  Did you go out

7   and get more tenants, did you list it for rent, what

8   did you do?

9       A.  I called Sandy.  I told her I was getting

10  ready to deploy.  I have no idea what I'm going to do

11  with the property.  She told me that -- she told me to

12  rent it, and she told me she would act as a property

13  manager for me.

14      Q.  So did you take her up on that offer?

15      A.  Yes.

16      Q.  So did you place an ad to rent it or did Sandy

17  place an ad to rent the property?

18      A.  I did not place an ad.  I don't know what she

19  did.

20      Q.  Did she secure a tenant for the property?

21      A.  Yes.

22      Q.  Did -- what involvement in that process did --

23  did you know who it was?

24      A.  No.

25      Q.  Do you recall when the tenancy started?

                                      Page 112

```
 1        A.   No.

 2        Q.   Do you recall how payments would be made?

 3        A.   Yes.

 4        Q.   How were they made?

 5        A.   Wrote a check.

 6        Q.   They wrote a check to who, to you or to Sandy?

 7        A.   I forget.  I don't know whether it was written

 8   to me or her.

 9        Q.   Was the amount of the rent sufficient to cover

10   the mortgage payments that you had to make?

11        A.   No.

12        Q.   Do you recall how much rent was being

13   received?

14        A.   Yes.

15        Q.   How much?

16        A.   2500.

17        Q.   So the property is being rented for 2500.  So

18   you're about, based on what you told me with your

19   mortgage payments, you're about a thousand dollars a

20   month short covering your mortgage payments, correct?

21        A.   Yes.

22        Q.   Do you recall when that -- when the payments

23   of $2500 a month started?

24        A.   No.

25        Q.   How did you get -- how would you get the $2500
```

                                             Page 113

```
 1        A.   Yes.   New Jersey.

 2        Q.   Thank you.   New Jersey.

 3             And you never got any of the deals about

 4   repayment or the money, none of this was in writing?

 5        A.   No.

 6        Q.   And you don't know who Sandy had as tenants

 7   during this time period you were deployed?

 8        A.   No.

 9        Q.   Did you ever notify HomeEq that you were no

10   longer -- while you were deployed, did you notify

11   HomeEq that you weren't receiving mail at the

12   property?

13        A.   No.

14        Q.   Did you ever notify HomeEq that you weren't

15   using the property as your principal residence?

16        A.   Say that again?

17        Q.   Did you ever tell HomeEq that you weren't

18   living in the property?

19        A.   No.

20        Q.   Did you ever tell HomeEq that the property was

21   being rented?

22        A.   No.

23        Q.   What were you doing about property insurance

24   while you were -- when you bought the house, did you

25   have property insurance?
```

Page 127

1        Q.   So who is getting the rental income?

2        A.   When I -- when I got back, I said the family

3    could stay there -- well, I don't remember.   I'm

4    thinking.

5        Q.   Do you recall ever getting any rental income?

6        A.   No.

7        Q.   Do you recall the rental income ever changing

8    from $2500 a month?

9        A.   I don't know.

10        Q.   Do you recall when you stopped making your

11    mortgage payments?

12        A.   Yes.

13        Q.   When was that?

14        A.   March of '09.

15        Q.   Why did you stop?   Why did you not make that

16    payment?

17        A.   I couldn't afford it.

18        Q.   Why had your circumstances changed so you

19    couldn't afford it in March like you could before?

20        A.   I got PCS orders.

21        Q.   PCS?

22        A.   Orders, yeah.

23        Q.   What does PCS stand for?

24        A.   Permanent change of station.

25        Q.   What does that mean?

Veritext Legal Solutions
866 299-5127

1       A.   That the Army was moving me from Hawaii to

2  South Carolina.

3       Q.   When did you get those orders?

4       A.   I can't remember exactly when.

5       Q.   Sometime before March of 2009?

6       A.   I don't know.

7       Q.   Is it accurate to say that when you left the

8  house in Hawaii of December of '07, did you ever live

9  there again at the property, the Ewa Beach property?

10      A.   After my deployment?

11      Q.   Yes.

12      A.   No.

13                (Exhibit No. 4 marked.)

14 BY MR. ROGERS:

15      Q.   Mr. Chung, what the court reporter has handed

16 to you what has been marked as Exhibit 4, which are

17 documents that were produced to us by your lawyer, and

18 they're Bates stamped Chung 228 through 231.  Then

19 there's a missing page and then 233.  Does your copy

20 include those page numbers?

21      A.   Chung 228 to what?

22      Q.   It looks like it goes 228 to 231 and then

23 there's a page without a --

24                MR. SHKLOV:  No, it's at the top left.

25                MR. ROGERS:  Oh, I'm sorry.  Thank you,

                                          Page 134

1        A.    Okay.

2        Q.    So this notice is dated February 4th, 2009,

3    correct?   It's on the top right.

4        A.    Yes.

5        Q.    And this says you're getting assigned to Fort

6    Jackson, South Carolina, on -- with a reporting date

7    of July 10th, 2009, correct?

8        A.    Yes.

9        Q.    So when you got this, was that when you

10   decided that you could no longer make your mortgage

11   payments?

12       A.    Yes.

13       Q.    Because you were going to be in South Carolina

14   and not in Hawaii; is that correct?

15       A.    Yes.

16       Q.    Did you ever explore any other options like --

17       A.    Excuse me, what?

18       Q.    -- continuing to rent the property and --

19   or --

20       A.    I don't -- I left out of here so fast I don't

21   remember.

22       Q.    What did you say?

23       A.    I don't remember.

24       Q.    What did you say before that?   Something about

25   "fast."

                                        Page 136

```
 1        A.  Yes.

 2        Q.  But you'd stopped making your mortgage

 3   payments in March of 2009, correct?

 4        A.  Yes.

 5        Q.  Did you ever visit the property during the --

 6   until -- the '09 period until you left for South

 7   Carolina?

 8        A.  No.

 9        Q.  Did you ever go to the post office and make

10   sure that your mail was forwarded?

11        A.  That, I don't remember.

12        Q.  Did you ever take any steps to make sure your

13   mail was not going to the property that you no longer

14   lived at?

15        A.  I can't remember.

16        Q.  Did you ever advise HomeEq of your move to

17   South Carolina?

18        A.  No.

19              MR. ROGERS:  We've been going about an

20   hour, you guys want to take a break?

21              MR. PAER:  Uh-huh.

22              MR. ROGERS:  We'll go off the record.

23              (Recess taken from 3:06 to 3:20.)

24   BY MR. ROGERS:

25        Q.  Mr. Chung, before we went on break, we were
```

Page 140

1        Q.   When did you experience back problems?

2        A.   Wow.   The summer of 2009.

3        Q.   So that was during your second -- that was

4    after your second deployment?

5        A.   Hold on a second, summer of 2004.   Correction,

6    summer of 2004.

7        Q.   Did you have a medical diagnosis as to your

8    back problem?

9        A.   At the time, no.

10        Q.   Have you since?

11        A.   Yes.

12        Q.   What's the diagnosis?

13        A.   I don't know what they said.

14        Q.   Did you talk to doctors about it?

15        A.   Yes.

16        Q.   You don't recall what they said?

17        A.   I don't know the terminology or whatever.

18        Q.   Does it still give you problems?

19        A.   Sometimes, yes.

20        Q.   When did you experience an IED explosion?

21        A.   July of 2004.

22        Q.   What was your injury or injuries?

23        A.   Nothing.   I didn't see anybody.

24        Q.   You didn't have any -- you didn't -- your body

25    was not injured by virtue of the IED?

                                        Page 192

```
1          A.   No.

2          Q.   Were other people in your unit injured?

3          A.   Yes.

4          Q.   So I had asked you initially about physical

5     injuries, you're not testifying that you were

6     physically injured by the IED in July of 2004; is that

7     correct?

8          A.   No.

9          Q.   Any other injuries during your deployments?

10         A.   I can't think of anything else right now.

11         Q.   Just the back and the IED in July of 2004?

12         A.   Right.

13         Q.   Did your unit suffer any casualties during

14    your deployments?

15         A.   Yes.

16         Q.   First deployment only or both?

17         A.   Both.

18         Q.   But other than your back problems, you were

19    never actually injured in combat or exchanges with the

20    enemy; is that correct?

21         A.   Besides the IED, no.

22         Q.   Okay.  Tell me what is your testimony with

23    respect to the IED.  Were you injured or were you not

24    injured?

25         A.   I couldn't see any medical help because I
```

1  wasn't bleeding physically.

2      Q.   Okay.

3      A.   But I know I was bleeding out of my ears.

4      Q.   You were bleeding out of your ears, but you

5  didn't get any medical help?

6      A.   No.   There wasn't any medical help where we

7  were.

8      Q.   Did you seek medical help after?

9      A.   No.

10      Q.   Did you ever tell anyone about your bleeding

11  from the ears?

12      A.   Yes.

13      Q.   Who did you tell?

14      A.   I believe I told the medical personnel at the

15  TBI clinic in Fort Drum.

16      Q.   What's TDI?

17      A.   TBI.

18      Q.   TBI.   Traumatic brain injury?

19      A.   Yeah.

20      Q.   Were you seeking treatment for a traumatic

21  brain injury?

22      A.   It's going to sound funny, but I'm going to

23  tell you I don't know because I went to TBI a lot.

24  They kept taking labs on me, doing tests on me and

25  stuff, so I don't know what I was being sent there

Page 194

```
 1          A.   Yes.

 2          Q.   And provide documents?

 3          A.   I don't remember providing any documents.

 4          Q.   Okay.  And do you recall any other time in

 5     your service in the military where you had to do that

 6     process to update your security clearance?

 7          A.   No.

 8          Q.   Were you ever told that you weren't promoted

 9     because of problems with your security clearance?

10          A.   No.

11          Q.   Were you ever told that you didn't get a

12     promotion because of your credit history?

13          A.   No.

14          Q.   Were you ever told anything about why you

15     hadn't been promoted to a certain position?

16          A.   Not that I can remember, no.

17          Q.   In the military will the reason someone is not

18     promoted be in someone's file, their records?

19          A.   I don't know.

20          Q.   Do you have custody of your military records?

21     What did they give you when you retired in terms of

22     documents?

23          A.   My retirement orders and my DD 214.

24          Q.   What is a DD 214?

25          A.   It's my separation paperwork.
```

Page 204

1          C E R T I F I C A T E

2

        I, JESSICA R. PERRY, do herby certify:

3

     That on Monday, December 12, 2016, at 11:05 a.m.,
4  appeared before me HEEJOON CHUNG, the witness whose
   deposition is contained herein; that prior to being
5  examined he was by me duly sworn or affirmed pursuant
   to Act 110 of the 2010 Session of the Hawaii State
6  Legislature;
7      That the deposition was taken down by me in machine
   shorthand and was thereafter reduced to typewriting;
8  that the foregoing represents, to the best of my
   ability, a true and correct transcript of the
9  proceedings had in the foregoing matter.
10     That pursuant to Rule 30(e) of the Hawaii Rules of
   Civil Procedure, a request for an opportunity to
11 review and make changes to this transcript:
12     _X_  Was made by the deponent or a party
             (and/or their attorney) prior to the
13           completion of the deposition.
       ____ Was not made by the deponent or a party
14           (and/or their attorney) prior to the
             completion of the deposition.
15     ____ Was waived.
16     I further certify that I am not an attorney for any
17 of the parties hereto, nor in any way concerned with
   the cause.
18     Dated this 30th day of December, 2016, in Honolulu,
19 Hawaii.
20

21

   <%signature%>
22 Jessica R. Perry, CSR NO. 404
23

24

25

                                          Page 220